## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

**MISTY S. COLEMAN**                                                    **PLAINTIFF**

**v.**                          **Case No. 5:18-cv-00166-KGB**

**ARKANSAS DIVISION**
**OF CORRECTION[1]**                                                   **DEFENDANT**

## OPINION AND ORDER

Before the Court is defendant Arkansas Division of Correction's ("ADC") motion for summary judgment (Dkt. No. 31).  Plaintiff Misty S. Coleman filed a response in opposition to defendants' motion for summary judgment (Dkt. No. 39).  The ADC filed a reply to Ms. Coleman's response (Dkt. No. 43).

For the following reasons, the Court grants the ADC's motion for summary judgment as to Ms. Coleman's federal race, color, sex, and disability discrimination claims and her retaliation claim (Dkt. No. 31).

### I.    Factual Background

Ms. Coleman brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. ("ADA"), to recover damages from ADC for the alleged unlawful discriminatory employment practices to which Ms. Coleman claims she has been subjected (Dkt. No. 2, ¶¶ 1, 8-9).  In her *pro se* complaint, Ms. Coleman contends that she has suffered damages

---

[1] In July 2019, the Arkansas Department of Correction was renamed the Arkansas Division of Correction.  The Clerk is instructed to substitute the Arkansas Division of Correction for the Arkansas Department of Correction as the defendant in this case.

on account of disparate treatment based on her race, color, sex, and disability (*Id.*, ¶ 8).[2]  Further, Ms. Coleman asserts that she was assaulted by a superior officer due to her prior investigation of that superior officer as a part of her employment (*Id.*, ¶ 9).

The ADC's motion for summary judgment is supported by its brief and a statement of undisputed material facts (Doc Nos. 32, 33).  Ms. Coleman filed a brief opposing the motion and her own concise statement of material facts for which she contends genuine issues of material fact exist (Dkt. Nos. 39, 40, 41).  The following facts are taken from these filings unless otherwise noted.

Ms. Coleman is the mother of two children ages 25 and 15.  She dropped out of high school in the 12th grade and later obtained her GED (Dkt. No. 39, ¶ 1).  Ms. Coleman attended Southeast Arkansas Community College, where she graduated with a 2-year degree in 2004; she later attended University of Arkansas at Pine Bluff, where she received a B.A. in Criminal Justice in 2010 (*Id.*).  Ms. Coleman is an African-American woman (Dkt. No. 33, ¶ 1).

On January 27, 2014, Ms. Coleman was hired as a Correction Officer I at the Department of Community Corrections Randall Williams Unit in Pine Bluff (Dkt. Nos. 33, ¶ 2; 39, ¶ 1).  She later applied for and was awarded a promotion to Sergeant and was stationed at ADC's Tucker Maximum Security Unit where the events in her complaint took place (Dkt. Nos. 33, ¶ 4; 39, ¶ 1).

The position of Correctional Officer I is a security position at ADC (Dkt. No. 33, ¶ 3).  Prior to going to work at the Randall Williams Unit, Ms. Coleman attended the ADC academy for several weeks and learned how to look for things and de-escalate situations with inmates, about policies, how to use different techniques of self-defense, and how to report rioting (*Id.*).  Ms.

---

[2]  After Ms. Coleman filed her *pro se* complaint, the Court granted Ms. Coleman's motion for the appointment of counsel (Dkt. No. 14).

Coleman completed an ADC employee acknowledgment form stating that she understood that it was her responsibility to read and become familiar with all policies, rules, regulations, benefits, standards, and procedures (*Id.*, ¶ 2).

Ms. Coleman's position as Sergeant at the Tucker Maximum Security Unit became effective on March 29, 2015 (*Id.*, ¶ 4).  The position of Sergeant is also considered a security position at the ADC (*Id.*).  As a Sergeant, Ms. Coleman's job responsibilities included, but were not limited to, the following:   (1) to schedule, distribute, and guide the work assignments of a protective services work staff and to assist supervisory staff; (2) to monitor inmates to prevent attempted escapes; (3) to maintain inmate logs, such as work activities, transfers, and inmate movements, and to prepare and maintain various department reports concerning unit and inmate activities; (4) to transport inmates to infirmary, meals, and various job sites throughout the state to perform maintenance work; (5) to inspect living areas to ensure safety and cleanliness; and (6) to perform other duties as assigned (*Id.*, ¶ 5).  Additionally, Ms. Coleman must have the ability to: (1) perform security inspection of buildings and grounds and perform other public safety activities; (2) supervise inmates; (3) conduct investigations; and (4) exercise self-defense tactics (*Id.*, ¶ 6).

At her deposition, Ms. Coleman testified that she did not dispute the essential job functions of a Sergeant also included the ability to:  (1) stand for prolonged periods, while observing inmates at assigned post; (2) walk for extended period of time; (3) sit for prolonged period of time at control booth or tower when assigned; (4) climb, ascend, and descend ladders or stairs using hands, arms, feet, and legs; (5) subdue or assist in subduing inmates and placing them in handcuffs and/or restraints; (6) respond to an emergency in a timely manner; (7) conduct pat searches and detect objects by touch; (8) perform manual dexterity and hand/eye coordination to operate locks with keys and operation of control boards that unlock doors; (9) fire and qualify with rifle, shotgun, and

3

pistol; (10) place and carry SCBA pack/tank on back; (11) carry injured inmate (with assistance) on backboard or stretcher; (12) drive vehicle in safe manner; (13) observe and accurately count the action of inmates and others; and (14) write legible reports and present oral reports as requested (*Id.*, ¶ 9).

After three months on the job, the Warden at the Tucker Maximum Security Unit, Danny Burl, assigned Ms. Coleman to the "Fusion Center," which in her estimation was a trusted place within the unit (Dkt. No. 39, ¶ 2). At her deposition, Ms. Coleman described it as like an internal affairs unit (*Id.*). The Fusion Center had no windows but had access to camera footage as well as personal files and investigation files (*Id.*). From the Fusion Center, Ms. Coleman would assist with investigations under the Prison Rape Elimination Act ("PREA") (*Id.*). Ms. Coleman would also potentially investigate contraband or drugs being brought into the unit, and, if a correctional officer was alleged to have had a relationship with an inmate, that investigation may fall to her as well (*Id.*). As part of her PREA duties, Ms. Coleman would necessarily investigate allegations against or involving coworkers and superior officers (*Id.*, ¶ 3). Even though Ms. Coleman was assigned additional duties related to the Fusion Center and PREA, Ms. Coleman still retained the job responsibilities of a Sergeant (*Id.*, ¶ 8).

Leading up to the events of July 15, 2016, Ms. Coleman, in the course of her job and during the earlier part of 2016, alleges that Ed Engstrom, Ph.D., an ADC forensic psychologist, called her "the devil" which she took as a reference to her job although he is a white male (*Id.*, ¶ 4). On July 7, 2016, inmate Freddie Choate bumped up against her left arm and shoulder "very hard," and despite Ms. Coleman's verbally reporting it to Major Carl Stout, there were no consequences directed at the inmate (*Id.*, ¶ 5). On July 13, 2016, Dr. Engstrom purportedly took an intimidating tone by saying that Ms. Coleman should not smile because it will make "us think you are up to

something and we can't have that." (*Id.*, ¶ 6).  On July 15, 2016, Ms. Coleman wrote an email to

Gregory Newsome alleging that Mr. Newsome had grabbed onto her arm and said, "let me taste

that." (*Id.*, ¶ 7).  She complained to him that she had been the object of unprofessional treatment

and told him not to grab or touch her again (*Id.*, ¶ 7).

On July 15, 2016, Ms. Coleman sustained an injury to her wrist which resulted in her taking

leave under the Family and Medical Leave Act ("FMLA") (Dkt. No. 33, ¶ 10).  At approximately

10 a.m. on July 15, 2016, Ms. Coleman went into Major Stout's office for him to sign off on PREA

investigation checklists (Dkt. No. 39, ¶ 8).  Captain John Spears was standing in Major Stout's

office (*Id.*).  Captain Spears is an African American man (Dkt. No. 33, ¶ 11).  Captain Spears

reached his hand out to shake Ms. Coleman's hand (Dkt. No. 39, ¶ 8).

Initially, Ms. Coleman hesitated to shake Captain Spears's hand (*Id.*).  At her deposition,

she testified:

> A.  . . . So when I shook his hand, he began to squeeze my hand.  I could hear my
> muscles or bones, like -- like, a crunchy pop -- as he squeezed down on my hand.
> And I began to try to get away from him.  He was stout.  So he squeezed and push
> down on my hand, and I'm jerking to try to get away from him and pulling[.  A]nd
> I couldn't.  He was too strong.  And as he pulled and made faces, he looked me up
> and down, and I'm trying to -- and I was telling him, "Stop.  Please let me go.
> Major, tell him to let me go."  Major was sitting in the chair while he was standing
> up, I was standing up.  He was laughing.  And --
>
> Q.  Who was laughing?
>
> A.  Major Stout. . . .

(*Id.*).

Ms. Coleman testified that she had not had any physical incidents with Captain Spears prior

to this incident on July 15, 2016 (Dkt. No. 39, ¶ 13).  Major Stout directed Ms. Coleman to go to

the infirmary (*Id.*, ¶ 14).  The infirmary nurses told Ms. Coleman that the infirmary is primarily

for the inmates, but they will assist with things such as cuts and Band-Aids (*Id.*).  Ms. Coleman

was also directed to contact "the company nurse" with regard to her injury (*Id*., ¶ 15).  Ms. Coleman immediately reported her injury to the company nurse who noted Ms. Coleman's rendition of the events (Dkt. No. 39, ¶ 9).  Ms. Coleman's rendition of the events to the company nurse is the same rendition Ms. Coleman recounts in her response to the ADC's motion for summary judgment (*Id*.)

On July 20, 2016, Ms. Coleman made several allegations against ADC staff at the Maximum Security Unit (Dkt. No. 33, ¶ 18).  Among the allegations, Ms. Coleman alleged that on July 15, 2016, Captain Spears assaulted her when he shook her hand in Major Stout's office (*Id*.).  The alleged incident between Ms. Coleman and Captain Spears was assigned incident #2016-07-120 (*Id*.).  On July 28, 2016, Warden Burl requested an investigation to be conducted by Internal Affairs relating to several allegations Ms. Coleman made against staff at the Maximum Security Unit  (Dkt. No. 33, ¶ 16).  Internal Affairs assigned the matter Case No. 16-286 (*Id*.).  Internal Affairs Investigator Susan Townsend was assigned to Case No. 16-286 (*Id*., ¶ 17).

Beginning July 31, 2016, ADC began deducting Ms. Coleman's accumulated sick leave and holiday pay (Dkt. No. 39, ¶ 10).  Prior to August 2, 2016, Human Resources Manager Felecia Williams sent to Ms. Coleman a document entitled, "Notice of Eligibility and Rights & Responsibilities (Family and Medical Leave Act)." (*Id*., ¶ 11).  Despite having accumulated vacation pay and sick time, in Part B of the FMLA Rights form the following was added, "[t]he attached FMLA paperwork must be completed and returned within 15 days of receipt by you or your leave time used to date may be denied under FMLA coverage." (*Id*., ¶ 11)

On August 1, 2016, Ms. Coleman completed ADC's Request for Family and Medical Leave form requesting FMLA leave and that her accrued paid leave be substituted for unpaid leave (Dkt. No. 33, ¶ 19).  Ms. Coleman requested that her FMLA leave begin on July 15, 2016, and end on August 30, 2016 (*Id*.).  On August 2, 2016, Ms. Williams sent Ms. Coleman an FMLA Notice

6

of Eligibility and Rights & Responsibilities form ("Notice") (*Id.*, ¶ 20).  The Notice informed Ms. Coleman, in part, of the following:  (1) Ms. Coleman was eligible for FMLA; (2) Ms. Coleman must return sufficient certification to support her request by August 17, 2016; (3) Ms. Coleman would be required to use her available paid, sick, and vacation leave during her FMLA absence; (4) Ms. Coleman would be required to furnish ADC with periodic reports of her status and intent to return to work every 30 days while on FMLA leave; and (5) Ms. Coleman had a right under FMLA for up to 12 weeks of unpaid leave in a 12-month calendar year (*Id.*).  Ms. Williams attached a Certification of Health Care Provider for Employee's Serious Health Condition form to be completed by a health care provider, which included an ADC essential job function questionnaire for a Correctional Sergeant to be completed by a physician (*Id.*).

ADC subsequently received a completed Certification of Health Care Provider for Employee's Serious Health Condition form by Dr. L.T. Alexander dated August 8, 2016 (*Id.*, ¶ 21).  In the Certification, Dr. Alexander indicated the probable duration of Ms. Coleman's condition would be from July 15, 2016, to August 30, 2016 (*Id.*).  The Certification further indicated that Ms. Coleman was unable to perform all of the job functions of a Sergeant (*Id.*).

On August 12, 2016, Investigator Townsend interviewed Ms. Coleman regarding incident #2016-07-120 (*Id.*, ¶ 22).  At the time of the interview, Ms. Coleman was on FMLA leave.  At the interview, Investigator Townsend asked Ms. Coleman to explain her allegations concerning Captain Spears (*Id.*).  Ms. Coleman alleged that she went into Major Stout's office concerning a PREA incident (*Id.*, ¶ 23).  Ms. Coleman stated that Captain Spears was also in the Major's office, and he held his hand out to shake her hand (*Id.*).  Ms. Coleman stated she shook his hand and that, when he squeezed her hand, it was so tight it cut off her circulation (*Id*).  Ms. Coleman stated she received a sprained wrist because he would not let go (*Id.*).  Ms. Coleman stated she reported the

incident, turned in a 005 incident report, and emailed Captain Spears in regard to the incident (*Id.*, ¶ 24).

A unit level investigation was conducted prior to the incident being referred to Internal Affairs, and statements were obtained from Major Stout and Captain Spears as part of that investigation (*Id.*, ¶ 25). Major Stout stated he did not witness Captain Spears attempt to injure Ms. Coleman and that he witnessed Captain Spears let go of Ms. Coleman's hand immediately after Ms. Coleman asked him to let go (*Id.*, ¶ 26). Captain Spears stated that, when he noticed Ms. Coleman in Major Stout's office, he reached out his hand to shake her hand and that Ms. Coleman did as well (*Id.*, ¶ 27). Captain Spears stated that Ms. Coleman stated, "let go of my hand," and he let go immediately of Ms. Coleman's hand and apologized (*Id.*). Captain Spears further stated that he and Ms. Coleman had always had a good professional work relationship, and he had never disrespected Ms. Coleman and would not do anything out of line (*Id.*). Captain Spears further states that Ms. Coleman then left Major Stout's office (*Id.*). Captain Spears believed that was the end of the incident until he received an email from Ms. Coleman (*Id.*, ¶ 28). Based on the investigation of Case No. 16-286, which included incident #2016-07-120, ADC Director Wendy Kelley, Deputy Director Dexter Payne, and Warden Burl concluded that Ms. Coleman's allegations were without merit, or unfounded (*Id.*, ¶ 29).

On August 29, 2016, ADC sent Ms. Coleman an FMLA Designation Notice (*Id.*, ¶ 30). In the Designation Notice, Ms. Coleman was informed that: (1) her FMLA leave request was approved; (2) the dates of July 15, 2016, to August 30, 2016, would be counted against her leave entitlement, provided there was no deviation from her anticipated leave schedule; (3) ADC required her to substitute or use paid leave during her FMLA leave; and (4) she would be required to present a fitness-for-duty certificate to be restored to employment, a list of the essential functions

of her position were attached, and the fitness-for-duty certification had to address her ability to perform those functions (*Id.*). On September 28, 2016, Ms. Coleman was sent a second FMLA Designation Notice (*Id.*, ¶ 31). In the second Designation Notice, Ms. Coleman was informed that: (1) her FMLA leave request was approved; (2) the dates of August 31, 2016, to October 7, 2016, would be counted against her leave entitlement, provided there was no deviation from her anticipated leave schedule; (3) ADC required her to substitute or use paid leave during her FMLA leave; and (4) she would be required to present a fitness-for-duty certificate to be restored to employment, a list of the essential functions of her position were attached, and the fitness-for-duty certification had to address her ability to perform those functions (*Id.*). To the knowledge of Ms. Williams, ADC did not receive any response to the September 28, 2016, Designation Notice sent to Ms. Coleman (*Id.*, ¶ 32). Ms. Coleman testified at her deposition that she stopped communicating with ADC regarding her FMLA leave after her workers' compensation payments started which was about two weeks after she took leave on July 15, 2016 (*Id.*). Ms. Coleman provided physician's statements as required and transmitted those to ADC (Dkt. No. 39, ¶ 14).

Ms. Coleman asserts that she was never paid any of her time off work nor her vacation pay because her workers' compensation claim was accepted as compensable, and workers' compensation began paying temporary total disability benefits at the rate of $1,024.00 every two weeks (*Id.*, ¶ 12). Ms. Coleman states that ADC issued a final temporary total disability payment March 26, 2017, through April 8, 2017 (*Id.*, ¶ 13). Ms. Coleman contends that, "[a]ll totaled, while on temporary total disability under workers' compensation, the [ADC], apparently according to policy, required her to use her unpaid medical leave while at the same time deducting some 275.25 hours of accumulated annual, vacation, and sick leave without compensation." (*Id.*).

Effective as of December 14, 2016, Ms. Coleman was terminated in accordance with ADC's FMLA policy or Administrative Directive 16-33 (Dkt. No. 33, ¶ 33). Pursuant to Administrative Directive 16-33, upon completion of the 12 week period, if the employee is unable to return to work, perform the essential functions of the position, and has depleted all of accrued leave, the employee will be terminated (*Id.*).

Warden Burl issued a termination of employment letter to Ms. Coleman on December 14, 2016 (*Id.*, ¶ 34). The termination letter informed Ms. Coleman that: (1) her FMLA leave was approved beginning on July 15, 2016, for up to a total of 12 weeks; (2) her FMLA leave was exhausted on October 7, 2016; (3) she was placed on leave without pay on October 9, 2016; (4) her employment with ADC was terminated effective December 14, 2016; (5) she would be considered for rehire upon recovery, provided she was able to perform all the essential job functions of her position or the essential job functions of the position for which she applied; and (6) if she did not agree with the Warden Burl's decision, she could appeal to ADC Equal Employment Opportunity Commission ("EEOC")/Grievance Officer within five days of receipt of the termination letter (*Id.*). After Warden Burl sent the termination letter, ADC determined that Ms. Coleman was actually placed on leave without pay on November 9, 2016, and not October 9, 2016 (*Id.*, ¶ 35).

On February 3, 2017, the ADC Grievance Office received a formal grievance from Ms. Coleman relating to her termination (*Id.*, ¶ 36). The first time Ms. Coleman requested an accommodation for her injury was when she filed a grievance with ADC, which occurred after she was terminated (*Id.*, ¶ 37). On February 28, 2017, Director Kelley informed Ms. Coleman that she elected for the option of an Internal Review Committee ("Committee") to review Ms. Coleman's formal grievance (*Id.*, ¶ 38). The Committee consisted of three employees: (1) Tammy Hurst,

Unit Human Resource Coordinator at the Construction Division; (2) Deborah Jacobs, Administrative Specialist III at Central Office; and (3) Kimyata Randall, Unit Human Resource Assistant at the East Arkansas Regional Unit (*Id*.).

On March 28, 2017, the Committee held a hearing regarding Ms. Coleman's termination and voted unanimously to uphold Ms. Coleman's termination, based on the following facts and AD 16-33:   (1) Ms. Coleman exhausted all FMLA; (2) leave without pay status; and (3) Ms. Coleman was unable to return to work based on her doctor's explanation and her own statement at the hearing (*Id*., ¶ 39).  Ms. Coleman testified at her deposition that she was not released from medical restrictions until after the Committee hearing regarding her grievance in 2017 (*Id*., ¶ 40).

On April 6, 2017, Director Kelley issued a decision regarding the Committee's recommendation on Ms. Coleman's formal grievance relating to her termination (Dkt. Nos 33, ¶ 41; 31-18).   Director Kelley upheld Warden Burl's decision to terminate Ms. Coleman's employment (*Id*.).  In the decision, Director Kelley stated, "[t]he agency made an accommodation by allowing you extra time to be able to recover and to submit verification of your ability to perform all of the essential functions of your position.  When you still could not provide this verification two months after your Family Medical Leave expired, and there was no apparent prospect of a change in that status, you were then terminated with a recommendation for rehire." (*Id*.).

Ms. Coleman appealed Director Kelley's decision to the State Employee Grievance Appeal Panel ("SEGAP") (Dkt. No. 33, ¶ 42).  On June 15, 2017, SEGAP held a hearing regarding Ms. Coleman's appeal of the ADC's decision (*Id*., ¶ 43).  The matter was assigned Case No. 2017-S16 (*Id*.).

On June 15, 2017, Ms. Coleman filed a charge of discrimination with the EEOC that was assigned a number of 493-2017-01259 ("EEOC Charge") (*Id*., ¶ 44).  In the EEOC Charge, Ms. Coleman claimed discrimination based on sex, retaliation, and disability (*Id*.).  Ms. Coleman claimed that the discrimination took place between December 14, 2016, and January 24, 2017 (*Id*.).  Ms. Coleman further stated that she believed that she was discharged because of:   (1) her sex, female; (2) retaliation for complaining about sexual harassment and assault; and (3) her disability and being denied a reasonable accommodation (*Id*.).  ADC responded to Ms. Coleman's EEOC Charge (*Id*., ¶ 45).

On June 28, 2017, SEGAP issued an administrative order in the matter of Ms. Coleman, Case No. 2017-S16 (*Id*., ¶ 46).  SEGAP made the following findings of fact:  (1) on July 15, 2016, Ms. Coleman was injured while shaking hands with her supervising Captain; (2) Ms. Coleman applied and was eligible for workers' compensation and FMLA benefits; (3) Ms. Coleman's FMLA began on July 15, 2016, and ended on or around October 9, 2016, with paid leave running currently; (4) ADC's policy states that, if after exhausting all FMLA, an employee is unable to return to work, perform the essential functions of the position, and has depleted all accrued leave, the employee will be terminated; (5) on October 9, 2016, Ms. Coleman was placed on leave without pay status by ADC because all available leave benefits had been exhausted; (6) Ms. Coleman was terminated on December 14, 2016, for exhausting her FMLA leave and because she was unable to perform the essential functions of her job; and (7) Ms. Coleman would be eligible for re-hire by ADC (*Id*., ¶ 47).  SEGAP upheld ADC's termination of Ms. Coleman and concluded that ADC complied with its policy to terminate Ms. Coleman following the exhaustion of her FMLA benefits and inability to perform the essential functions of her job (*Id*., ¶ 48).

Ms. Coleman appealed SEGAP's administrative order to the Chief Fiscal Officer ("CFO") of the State of Arkansas, Larry Walther (*Id*., ¶ 49).  On August 28, 2017, CFO Walther issued his final administrative order relating to the appeal of the SEGAP's ruling in the matter of Ms. Coleman, Case No. 2017-S16, affirming the SEGAP order (*Id*., ¶ 50).  CFO Walther held that "[t]he Agency's policy is clear that if an employee has exhausted all FMLA and is unable to perform the essential functions of the job, the employee will be terminated.  SEGAP's finding that the Agency followed its policy is not clearly erroneous or arbitrary, capricious and unreasonable, or contrary to policy.  The Termination is upheld, although, the Agency has stated that Ms. Coleman is eligible for rehire." (*Id*., ¶ 51).

On March 29, 2018, the EEOC issued a Dismissal and Notice of Rights letter regarding Ms. Coleman's EEOC Charge (*Id*., ¶ 52).

## II.     Legal Standard

Summary judgment is appropriate if there is no genuine issue of material fact for trial. *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Fed. R. Civ. P. 56).  Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'"  *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Johnson Reg'l Med. Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008), *cert. denied*, 522 U.S. 1048 (1998).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

Importantly, "[t]here is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (citing *Fercello v. County of Ramsey*, 612 F.3d 1069, 1077 (8th Cir. 2010)).  "Although employment discrimination cases are 'often fact intensive and dependent on nuance in the workplace, they are not immune from summary judgment.'"  *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 459 (8th Cir. 2011) (quoting *Fercello*, 612 F.3d at 1077).

### III.    Analysis

Ms. Coleman's complaint alleges that she was discriminated against on the basis of her race, color, sex, and disability (Dkt. No. 2).  Ms. Coleman alleges that the discrimination occurred

on July 15, 2016, when she was "assaulted by a superior officer due to prior investigation against my superior" (Dkt. No. 2, at 2-3).

The ADC argues that, because Ms. Coleman did not allege in her complaint that she was "discriminated against for being terminated," the Court should limit its analysis to events that occurred on July 15, 2016, when she alleges that she was assaulted by a superior officer due to a prior investigation of that supervisor (Dkt. No. 32, at 2).

### A.      Failure To Exhaust Administrative Remedies

"The claims of employment discrimination in the complaint may be as broad as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge." *Kirklin v. Joshen Paper & Packaging of Arkansas Co.*, 911 F.3d 530, 536 (8th Cir. 2018) (quoting *Shelton v. Boeing Co.*, 399 F.3d 901, 912 (8th Cir. 2005)).  In *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851-52 (8th Cir. 2012), however, the Eighth Circuit held that "discrete acts" of unlawful discrimination or retaliation that were not exhausted in an EEOC charge— whether such acts occurred before or after a charge is filed—cannot circumvent Title VII's exhaustion requirement under the "like or reasonably related to" test.  *Richter*, 686 F.3d at 852 (citing *Wedow v. City of Kansas City, Missouri*, 442 F.3d 661, 672-73 (8th Cir. 2006)).

Title VII requires that a plaintiff must also exhaust her remedies by giving notice of all claims of discrimination in the EEOC charge.  *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 630-31 (8th Cir. 2000).  Claims outside the scope of the EEOC charge circumvent the EEOC's investigative and conciliatory process and fail to provide the charged party with notice.  *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.

### 1.    Race And Color

ADC moves for summary judgment as to Ms. Coleman's claims of discrimination based on her race and color because Ms. Coleman failed to allege such claims in the EEOC Charge she filed or in any other timely EEOC charge (Dkt. No. 31, ¶ 2).  In her response, Ms. Colman concedes that a charge of racial discrimination was not a part of either the intake form before the EEOC or the EEOC Charge she filed (Dkt. No. 41, at 5).

Based on the record before the Court, the Court finds that Ms. Coleman did not exhaust her claims of discrimination based on race and color.  The Court grants the ADC's motion for summary judgment and enters judgment in favor of the ADC on Ms. Coleman's claims of discrimination under Title VII based on race and color (Dkt. No. 31).

### 2.    Sexual Harassment And Retaliation

ADC argues that Ms. Coleman failed to exhaust properly her claims that Captain Spears sexually harassed her in retaliation for her prior investigation of a complaint against Captain Spears (Dkt. No. 31, ¶ 2).  ADC points out that, in her EEOC Charge, Ms. Coleman claims that she reported to Warden Burl in July 2016 that she was sexually harassed by a co-worker (Dkt. No. 32, at 18).  ADC states that "the sexual harassment, therefore, would have had to occur prior to Coleman reporting allegations of such in July of 2016." (*Id*.).  ADC argues that Coleman failed to file her EEOC Charge within 180 days of the alleged sexual harassment and assault against her in retaliation for investigating her superior officer.

Title VII requires that charges first be filed with the EEOC within 180 days of when the unlawful employment practice occurred.  *See* 42 U.S.C. § 2000e–5(e)(1) (stating that, under Title VII, EEOC Charge must be filed within 180 days of when alleged unlawful employment practice occurred; 300–day filing period applies if person initially instituted state or local agency

proceedings); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109–110 (2002) (holding that timely EEOC charge is mandatory).  Further, even if a plaintiff files a timely charge, that plaintiff must also exhaust his remedies by giving notice of all claims of discrimination in the EEOC charge. *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 630-31 (8th Cir. 2000).  Claims outside the scope of the EEOC charge circumvent the EEOC's investigative and conciliatory process and fail to provide the charged party with notice.  *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004), *abrogated on other grounds by Torgerson*, 643 F.3d 1031.

Ms. Coleman's EEOC Charge was filed on June 15, 2017 (Dkt. No. 31-5).  Accordingly, events occurring prior to December 17, 2016, which is 180 days prior to June 15, 2017, may be included in this action if Ms. Coleman alleged a continuing violation.  The Supreme Court has held that discrete acts such as termination, failure to promote, denial of transfer, and refusal to hire are "not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Morgan*, 536 U.S. at 114.

In her EEOC Charge, Ms. Coleman alleges discrimination from December 14, 2016, to January 24, 2017 (Dkt. No. 31-5).  She asserts that she learned that ADC terminated her on January 24, 2017, and that, on or about January 27, 2017, she received "a certified letter of termination dated December 14, 2016." (*Id.*).  In her EEOC Charge, Ms. Coleman states that she was terminated "in retaliation for complaining about sexual harassment and assault in violation of Title VII" and that she was "denied a reasonable accommodation and discharged because of my disability, in violation of the Americans With Disabilities Act of 1990, as amended." (*Id.*).

In her complaint filed with this Court, Ms. Coleman alleges that ADC discriminated against her "on or about July 15, 2016." (Dkt. No. 2, ¶ 5).  She asserts that ADC discriminated against her on the basis of race, color, sex, and "Disabilities Act" (*Id.*, ¶ 8).  Ms. Coleman contends that

the circumstances under which ADC discriminated against her were that she "was assaulted by a superior officer due to prior investigation against my superior." (*Id.*, ¶ 9).  Her complaint does not refer to her termination, but, as part of her relief, she requests that "Defendant be directed to re-employ plaintiff." (Dkt. No. 2, at 3).

In response to ADC's argument that she has not exhausted properly her administrative remedies with respect to the claims in her complaint of sexual harassment and retaliation for her prior investigation of a superior officer, Ms. Coleman argues that she presents a "genuine issue of material fact regarding her gender discrimination charge." (Dkt. No. 41, at 5).  Ms. Coleman asserts that she may seek relief "for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." (*Id.*, at 6 (quoting *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 838 (8th Cir. 2002)).  Ms. Coleman also states that "'retaliation claims are not reasonably related to underlying discrimination claims' unless the claim alleges that the Defendant retaliated against the Plaintiff for filing an EEOC charge alleging discrimination." (*Id.* (citing *Wallin v. Minn. Dept. of Correction*, 153 F.3d 681, 688 (8th Cir. 1998); *Mach v. ABB Inc.*, Case No. 2:18-CV-2194, 2019 WL 362431, at *2 (W.D. Ark. Jan. 29, 2019)).  Ms. Coleman states that the issue is whether a "reasonable relationship exists between the allegation of discrimination and the ultimate termination." (*Id.*).  Ms. Coleman admits that "courts do not typically acknowledge that there is such a relationship," but she states that from her point of view, "the circumstances are part of the same conduct, and nothing that the State has presented resolves the issue of intent." (*Id.*).  Ms. Coleman argues that "the discrimination occurred in such a way as to ultimately result in the Plaintiff's termination to occur thereby allowing the original purpose to come to fruition." (Dkt. No. 41, at 6).

The Court concludes that Ms. Coleman has failed to exhaust any claims that may have arisen prior to December 14, 2016, which is the date she identified in her EEOC Charge as the earliest date the alleged conduct began.  Accordingly, Ms. Coleman's claims in her complaint related to her alleged assault by a superior officer in August 2016 and her prior investigation of the superior officer were not exhausted properly.  The Court grants the ADC summary judgment in its favor on those claims (Dkt. No. 2, ¶¶ 6, 9).

Because Ms. Coleman in her EEOC Charge alleges that the ADC discriminated against her "because of her sex, female, and in retaliation for complaining about sexual harassment and assault, in violation of Title VII," the Court will consider the merits of Ms. Coleman's exhausted claims of gender discrimination and retaliation (Dkt. No. 31-5).

### B.    Gender Discrimination

Ms. Coleman purports to state gender discrimination claims under Title VII.  Ms. Coleman can establish a *prima facie* claim of discrimination either by providing direct evidence of discrimination or by creating an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-05 (1973).  *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012).

Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.  *Torgerson*, 643 F.3d at 1044 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)).  "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence.  A plaintiff with strong direct evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether

his strong evidence is circumstantial." *Id*. However, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext." *Id*.

Under the *McDonnell Douglas* analysis, the elements of a *prima facie* discrimination claim are:  (1) the employee belonged to a protected class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) she was treated differently from similarly situated employees who do not belong to the protected class.  *Hesse v. Avis Rent A Car System, Inc*., 394 F.3d 624, 631 (8th Cir. 2005).  The fourth element of a *prima facie* discrimination case also can be met if the employee provides "some other evidence that would give rise to an inference of unlawful discrimination."  *Putman v. Unity Health Sys*., 348 F.3d 732, 736 (8th Cir. 2003). Once an employee establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions, and then shifts back to the employee to show that the employer's reason was pretextual.  *Hesse*, 394 F.3d at 631.

### 1.    Direct Evidence

Ms. Coleman claims, "that the discrimination against her was direct." (*Id*.).  Ms. Colman argues that "Captain Spears should be made to explain to a jury how his actions were not intimidation by a man to a woman through his mannerisms which caused Coleman objective injury and how his discriminatory acts against Ms. Coleman based upon his length of employment, position, and experience with subordinates who were injured were not calculated to or were not likely to culminate with her ultimate firing or reassignment." (Dkt. No. 41, at 7-8).  For the reasons explained in this Order, the Court concludes that Ms. Coleman did not exhaust her claims with respect to this incident, which occurred in July 2016.

In her EEOC Charge, Ms. Coleman asserts that she was discharged because of her gender, female, and in retaliation for complaining about sexual harassment and assault.  Ms. Coleman includes in her statement of facts a number of emailed complaints from July 2016, against an inmate and various co-workers.  The emailed complaints relate to actions by an inmate, Freddie Choate, and co-workers, Dr. Engstrom, Mr. Newsom, Major Stout, and Captain Spears, that took place from July 7, 2016, to July 15, 2016.  For the reasons explained in this Order, these incidents are all outside the scope of Ms. Coleman's EEOC Charge.

Ms. Coleman has not come forward with direct evidence that the Court may properly consider that the ADC terminated her because of her gender or because she complained of sexual harassment and assault.  The evidence before the Court indicates that Warden Burl issued a termination of employment letter to Ms. Coleman on December 14, 2016, informing Ms. Coleman that her FMLA leave was approved beginning on July 15, 2016, for up to a total of 12 weeks; her FMLA leave was exhausted on October 7, 2016; she was placed on leave without pay on November 9, 2016; and her employment was terminated effective December 14, 2016 (Dkt. No. 33, ¶¶ 34-35)  Warden Burl's letter also informed Ms. Coleman that she would be considered for rehire upon recovery and provided she was able to perform all of the essential job functions of her position or the essential job functions of a position for which she applies (*Id.*, ¶ 34). Ms. Coleman grieved her termination with the ADC, which upheld her termination, based on the ADC's FMLA policy, at every level of the grievance process (*Id.*, ¶¶ 36, 38-43, 46-51).

Based on the evidence in the record, the Court finds that no reasonable fact finder could conclude that Ms. Coleman has come forward with direct evidence of gender discrimination or retaliation based on her gender.  Therefore, the Court proceeds to analyze Ms. Coleman's gender discrimination claim under the *McDonnell Douglas* analysis.

### 2.   *Prima Facie* Case

ADC argues that Ms. Coleman has not come forward with sufficient evidence to establish a *prima facie* case of gender discrimination under the *McDonnell Douglas* analysis.  Specifically, ADC asserts that she cannot demonstrate that she was meeting her employer's legitimate job expectations and cannot demonstrate that similarly situated employees outside of the protected class were treated differently (Dkt. No. 43, ¶ 9).

Ms. Coleman does not dispute that, at the time of her termination and during the time she was on FMLA leave, she could not perform the essential functions of her job.  Further, Ms. Coleman does not dispute that under the ADC's FMLA policy, AD 16-33, "[a]ll Security staff employees who have been on FMLA due to his/her own health condition are required to provide the essential job function questionnaire completed by their health care provider certifying their fitness for duty prior to returning to work." (Dkt. No. 31-7, ¶ 8).  Documents provided to ADC by Ms. Coleman established that Ms. Coleman had medical restrictions that prevented her from performing her job duties (Dkt. Nos. 31-11, 31-15).  At her deposition, Ms. Coleman testified that she was not released from her health care provider to return to work until after her first grievance hearing on March 28, 2017 (Dkt. Nos. 31-1, at 67-68; 31-17).  Based on the record evidence, the Court finds that no reasonable juror could conclude that Ms. Coleman was meeting ADC's legitimate expectations for a Sergeant at the time of her termination.  *See Jarrett v. Nobel Learning Communities, Inc.*, Case No. 12 C 9432, 2014 WL 1612610, *6 (N.D. Ill. Apr. 21, 2014) (district court found that, because medical restrictions prevented plaintiff from performing her job duties immediately before and during the period she was on FMLA leave and personal leave, it was undisputed that plaintiff was not meeting her employer's legitimate job expectations).

Additionally, ADC argues that Ms. Coleman has not come forward with evidence to establish that similarly situated employees outside of the protected class were treated differently. "While the burden of establishing a *prima facie* case of disparate treatment is not onerous, the plaintiff must be able to produce some evidence of similarity between her and her comparator." *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087-88 (8th Cir. 2015) (internal quotation and citation omitted). Because the required showing for a *prima facie* case is a "flexible evidentiary standard," a plaintiff can establish an inference of discrimination to satisfy this element in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, by showing biased comments by a decisionmaker, or by showing pretext with evidence that an employer failed to follow its own policies or shifted its explanation of the employment decision. *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 774 (8th Cir. 2016). Reviewing the evidence in the light most favorable to Ms. Coleman, she has not identified any similarly situated employees outside of the protected class who were treated differently by ADC.

Ms. Coleman was asked at her deposition to describe the conduct for which she alleged gender discrimination, and Ms. Coleman stated that she "was the only black female in the [F]usion [C]enter. I have never witnessed John Spears physically assaulting any of the males in the [F]usion [C]enter." (Dkt. No. 31-1, at 38). Ms. Coleman's testimony relates to her unexhausted claims. Ms. Coleman has not alleged, as she must to make a *prima facia* case of gender discrimination based on her termination, that there were other male employees, who exhausted their FMLA and paid leave, who were on leave without pay for over a month, and who were not terminated when they could not perform the essential functions of their job.

Based on the record evidence, construing all reasonable inferences in favor of Ms. Coleman, the Court determines that no reasonable juror could find in Ms. Coleman's favor on the second or the fourth elements of her gender discrimination claim based on her termination.

### 3.      Legitimate Nondiscriminatory Reason

ADC contends that, even if Ms. Coleman could make out a *prima facia* case, it has established a nondiscriminatory reason for terminating Ms. Coleman (Dkt. No. 32, at 33-34).   The employer's burden to articulate a nondiscriminatory reason is "not onerous."   *Flloyd v. State of Mo. Dep't of Soc. Servs., Div. of Family Servs.*, 188 F.3d 932, 936 (8th Cir. 1999).   ADC argues that Ms. Coleman requested FMLA leave, exhausted her FMLA and paid leave, was on leave without pay for over a month, and then was terminated, according to ADC policy, for being unable to return to work and for being unable to perform the essential functions of her job as a Sergeant (*Id.*, at 33).   ADC further points out that Ms. Coleman appealed her termination; an Internal Review Committee of three ADC employees from outside her unit held a hearing on her grievance and recommended that Director Kelley uphold Ms. Coleman's termination (*Id.*, at 33-34).   Director Kelley adopted the recommendation and upheld Ms. Coleman's termination (*Id.*, at 34).   Ms. Coleman's appeals of that decision were denied (*Id.*).

The Court finds, based on the record evidence even with all reasonable inferences construed in Ms. Coleman's favor, that ADC has stated a legitimate, non-discriminatory reason for Ms. Coleman's termination.

### 4.      Pretext

Once the employer articulates a legitimate, non-discriminatory reason for the challenged conduct, the plaintiff must produce sufficient evidence to create a genuine issue of material fact regarding whether the proffered reason is mere pretext for intentional discrimination.  *Pope v. ESA*

*Servs., Inc.*, 406 F.3d 1001, 1007 (8th Cir. 2005).  The plaintiff has the burden of showing, by a preponderance of the evidence, that the employer's proffered reason for the challenged action is not true and that discrimination was the real reason.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

"At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'"  *Bone*, 686 F.3d at 956 (quoting *Rodgers v. U.S. Bank, N.A.,* 417 F.3d 845, 853 (8th Cir. 2005)).  To succeed at the pretext stage, Ms. Coleman must show that she and the potential comparators she identifies were "similarly situated in all relevant respects." *Id.* (quoting *Rodgers,* 417 F.3d at 853).  That is, the employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)).

Viewing the record evidence in the light most favorable to Ms. Coleman, no reasonable fact finder could conclude that Ms. Coleman has identified any comparators to demonstrate pretext.  Ms. Coleman has failed to identify any purported comparator not in the protected class who exhausted her FMLA and paid leave, could not perform the essential functions of the job of Sergeant, and were not terminated under the ADC's FMLA policy.

### C.   Retaliation Based On Gender

In her EEOC Charge, Ms. Coleman alleges that she was discharged in retaliation for complaining about sexual harassment and assault in violation of Title VII (Dkt. No. 31-5).  To establish a *prima facie* case of retaliation, Ms. Coleman must show:  (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal

connection existed between the protected activity and the adverse action. *Wilkie v. Dept. of Health and Human Services, Inc.*, 638 F.3d 944, 955 (8th Cir. 2011). For a Title VII claim, "[r]etaliation must be the 'but for' cause of the adverse employment action." *Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016) (internal revisions, quotations, and citations omitted). For these claims, "[i]t is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Blomker*, 831 F.3d at 1059 (citations omitted). If Ms. Coleman establishes a *prima facie* case of retaliation, the Court applies the *McDonnell Douglas* framework. *See Shirrell v. St. Francis Medical Center*, 793 F.3d 881, 887 (8th Cir. 2015).

ADC alleges that Ms. Coleman has not established a causal connection between her complaint about the alleged sexual harassment and assault and her termination (Dkt. No. 32, at 25). Ms. Coleman reported allegations of workplace harassment against ADC staff on July 20, 2016 (Dkt. No. 31-3, ¶ 6). Ms. Coleman's allegations were investigated at the unit level and then by an Internal Affairs Investigator on August 12, 2016 (*Id.*, ¶¶ 7-14). Ms. Coleman was not terminated until December 2016, almost five months after reporting the alleged harassment in July 2016. Further, timing on its own is "not sufficient to show that an employer's non-discriminatory [or non-retaliatory] reason for [an adverse employment action] is merely pretext." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) (internal citations and quotations omitted).

Warden Burl's letter is clear that Ms. Coleman was terminated under ADC's FMLA policy but that she was eligible for rehire when she could perform the essential functions of the job or any other job for which she applied with ADC. Ms. Coleman grieved her termination under the ADC grievance policy, but Warden Burl's decision to terminate of Ms. Coleman under ADC's FMLA policy was upheld at every level of the grievance process.

26

Viewing the record evidence in the light most favorable to Ms. Coleman, no reasonable juror could conclude that there is a causal connection between Ms. Coleman's complaints about harassment in July 2016 and her termination in December 2016.

For all of these reasons, ADC is entitled to judgment in its favor of Ms. Coleman's gender discrimination claim.

### D.    Disability Discrimination

The ADA prohibits employers from discriminating against a disabled individual qualified for a job because of such individual's disability.  *See* 42 U.S.C. § 12112(a).  In the absence of direct evidence of discrimination, the Court must analyze Ms. Coleman's disability discrimination claim under the *McDonnell Douglas* burden-shifting framework.  *Power v. Univ. of N. Dakota Sch. of L.*, 954 F.3d 1047, 1052 (8th Cir. 2020) (citing *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1074 (8th Cir. 2006) (citing *McDonnell Douglas*)).

In order to make out a *prima facie* case of discrimination under the ADA, Ms. Coleman must show that:  (1) she is a "qualified individual" under the ADA, (2) she suffered discrimination as the term is defined by the ADA, and (3) the discrimination was based on disability as defined by the ADA.  *See Brown v. City of Jacksonville*, 711 F.3d 883, 888 (8th Cir. 2013).  A "qualified individual" is a person with a qualifying disability who can "perform the essential functions of the employment position . . . with or without reasonable accommodation."  42 U.S.C. § 12111(8).  Additionally, "'discriminat[ion]' under the ADA, means an 'adverse employment action.'"  *Brown*, 711 F.3d at 888 (quoting *Bensons v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995)).

If Ms. Coleman establishes a *prima facie* case, then the burden shifts to ADC to articulate a legitimate, nondiscriminatory reason for terminating Ms. Coleman and then back to Ms. Coleman to show the articulated reason was merely a pretext for discrimination.  *See Power*, 954 F.3d at

1052 (citing *Torgerson*, 643 F.3d at 1046); *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 544 (8th Cir. 2018).

ADC argues that Ms. Coleman cannot establish a *prima facia* case of disability discrimination because she is not a qualified individual under the ADA. In order to be a qualified individual under the ADA, Ms. Coleman must: "(1) possess the requisite skill, education, experience, and training for h[er] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 371 (8th Cir. 2018) (citing *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003) (quoting *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001)). In determining whether a job function is essential, the Court considers evidence including what functions the employer thinks are essential, written job descriptions, how much time an employee spends on the job performing the function, the consequences of not having the employee perform the function, and whether other current employees in similar jobs perform the function. *Scruggs v. Pulaski Cty., Ark.*, 817 F.3d 1087, 1092 (8th Cir. 2016) (citing *Hill v. Walker,* 737 F.3d 1209, 1217 (8th Cir.2013)). Although not conclusive, the employer's judgment of what constitutes an essential function is "highly probative." *Id.* at 1093 (citing *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 786 (8th Cir. 2004) (quoting *Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir. 2003)).

Ms. Coleman asserts that "[t]here is no doubt that her injury was such that she would be at a greater disadvantage upon any inmate attack upon her. However, the [ADC] placed her in the very position she found herself through the injury inflicted upon her and now uses a remedial statute to protect those with disabilities as an offensive weapon against her." (Dkt. No. 41, at 9)

The record evidence establishes that, as a Sergeant, Ms. Coleman's job responsibilities included: (1) scheduling, distributing, and guiding the work assignments of the protective services

work staff and assisting supervisory staff; (2) monitoring inmates to prevent attempted escapes; (3) maintaining inmate logs, such as work activities, transfers, and inmate movements and preparing and maintaining various department reports concerning unit and inmate activities; (4) transporting inmates to infirmary, meals, and various job sites throughout the state to perform maintenance work; (5) inspecting living areas to ensure safety and cleanliness; and (6) performing other duties as assigned (Dkt. Nos. 31-2, ¶ 8; 31-8).   Additionally, Ms. Coleman was required to have the ability to:  (1) perform security inspection of buildings and grounds and perform other public safety activities; (2) supervise inmates; (3) conduct investigations; and (4) exercise self-defense tactics (Dkt. No. 31-2, ¶ 6; 31-8).

At her deposition, Ms. Coleman testified that she did not dispute the job functions listed in the Sergeant Job Function Questionnaire attached to the Certification completed by Dr. Alexander on August 8, 2016, were job responsibilities of a sergeant (Dkt. No. 31-1, at 51-54).  The Sergeant Job Function Questionnaire included the following job functions, ability to:  (1) stand for prolonged periods, while observing inmates at assigned post; (2) walk for extended period of time; (3) sit for prolonged period of time at control booth or tower when assigned; (4) climb, ascend, and descend ladders or stairs using hands, arms, feet, and legs; (5) subdue or assist in subduing inmates and placing them in handcuffs and/or restraints; (6) respond to an emergency in a timely manner; (7) conduct pat searches and detect objects by touch; (8) perform manual dexterity and hand/eye coordination to operate locks with keys and operation of control boards that unlock doors; (9) fire and qualify with rifle, shotgun, and pistol; (10) place and carry SCBA pack/tank on back; (11) carry injured inmate (with assistance) on backboard or stretcher; (12) drive vehicle in safe manner; (13) observe and accurately count the action of inmates and others; and (14) write legible reports and present oral reports as requested (*Id*., at 53-54).  Ms. Coleman also does not

dispute that when Dr. Alexander completed the Questionnaire on August 8, 2016, he found she could not perform the functions listed on the Questionnaire (*Id.*, at 52-53).

In a December 23, 2016, Essential Job Function Questionnaire completed by Brian Norton, M.D., Dr. Norton indicated that Ms. Coleman could not perform the following job functions of a Sergeant with or without reasonable accommodation: climb, ascend, and descend ladders or stairs using hands, arms, feet and legs; subdue or assist in subduing inmates and placing them in handcuffs and/or restraints; conduct pat searches and detect objects by touch; perform manual dexterity and hand/eye coordination to operate locks with keys and operation of control boards that unlock doors; fire and qualify with rifle, shotgun, and pistol; place and carry SCBA pack/tank on back; carry injured inmate (with assistance) on backboard or stretcher; observe and accurately count the action of inmates and others; and write legible reports and present oral reports as requested (Dkt. No. 31-15).

Ms. Coleman testified that, at the time of her Committee hearing in March 2017, after she was terminated in December 2016, her health care provider had still not cleared her to perform all of the functions of the job of Sergeant (*Id.*, at 64-65).

The Court finds, based on the evidence before it, that no reasonable juror could find that Ms. Coleman could perform the essential functions of the job of Sergeant at the time of her termination in order to find Ms. Coleman was a qualified individual under the ADA.

Ms. Coleman argues that "[t]he State focuses solely on Coleman's former job and position yet fails to explain why there are no other reasonable accommodations for her at any job within the ADC." (Dkt. No. 41, at 9). To the extent Ms. Coleman intends this to be a failure to accommodate claim, this claim also fails.

To prevail on a failure to accommodate claim, a plaintiff "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015); *see also Moses v. Dassault Falcon Jet-Wilmington Corp.*, 894 F.3d 911, 923-24 (8th Cir. 2018) (affirming summary judgment on plaintiff's failure to accommodate claim because plaintiff failed to show that he was a qualified individual); *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016) (affirming summary judgment on plaintiff's failure to accommodate claim because plaintiff failed to show that she suffered an adverse employment action).

As set forth above, Ms. Coleman has failed to make out a *prima facie* case of disability discrimination under the ADA.  Further, to establish a failure to accommodate claim, Ms. Coleman must also show, "that the requested accommodation is 'reasonable on its face, *i.e.*, ordinarily or in the run of cases.'" *Peebles v. Potter*, 354 F.3d 761, 768 (8th Cir. 2004) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002)).  "Upon such a showing, the employer is left to 'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'"  *Id.* (quoting *Barnett*, 535 U.S. at 402).  In practice, the Eighth Circuit has articulated a four-part test for evaluating these claims, under which the plaintiff must demonstrate: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Ballard*, 284 F.3d 957, 960 (internal quotations and citations omitted).

On the record before the Court, even if Ms. Coleman could establish a *prima* case of discrimination under the ADA, she has not met her burden of establishing a failure to accommodate

31

claim.  The record evidence before the Court even with all reasonable inferences drawn in favor

of Ms. Coleman indicates that Ms. Coleman's physician did not consider her to have a permanent

disability.  According to Dr. Alexander, Ms. Coleman's estimated date of incapacity was July 15,

2016, through August 30, 2016.  After Ms. Coleman's termination, Dr. Norton noted on his

December 2016 Questionnaire that Ms. Coleman's disability was "temporary." (Dkt. No. 31-15).

Even if Ms. Coleman could establish that she was an employee with a disability, Ms.

Coleman did not request an accommodation until she filed a grievance in appeal of her termination

on February 3, 2017, several weeks after her termination.  There is no record evidence that Ms.

Coleman specifically applied for rehire or for consideration in any other position with ADC after

her termination.  Further, Ms. Coleman has not established that she could have been reasonably

accommodated but for ADC's lack of good faith.  Ms. Coleman has not come forward with any

accommodation that she claims would have been reasonable.  *See Scruggs v. Pulaski Cty., Ark.*,

817 F.3d 1087, 1093 (8th Cir. 2016) (rejecting employee's request for an additional week of unpaid

leave after her FMLA leave expired as an accommodation so that she could obtain a different

FMLA certification or move her to the 11:00 p.m. to 7:00 a.m. shift because the FMLA only

entitles an employee to 12 weeks of leave per year; it does not entitle an employee to extended

leave once the 12 weeks has been used) (citing *Slentz v. City of Republic, Mo.,* 448 F.3d 1008,

1010–11 (8th Cir. 2006) ("Under the FMLA, twelve weeks of leave is both the minimum the

employer must provide and the maximum that the statute requires.") (other citation omitted)).

Even if the Court were to find that Ms. Coleman had requested a reasonable

accommodation under the ADA, Ms. Coleman did not carry her burden to show that she could

perform the essential functions of her job with that accommodation.  *See id.* (citing *Alexander v.

Northland Inn,* 321 F.3d 723, 727 (8th Cir. 2003) (determining that it is the ADA plaintiff's burden

to show that she could perform the essential functions of her job with a reasonable accommodation)).

Based on the record before the Court, no reasonable juror could find either that Ms. Coleman has made out a *prima facia* case of disability discrimination under the ADC or that Ms. Coleman has established a failure to accommodate claim under the ADA. ADC is entitled to judgment in its favor on Ms. Coleman's disability discrimination claims.

### E.    Retaliation Under The ADA

In her EEOC Charge, Ms. Coleman alleges that the ADC retaliated against her when it terminated her because of her disability (Dkt. No. 31-5). The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The Eighth Circuit Court of Appeals also has held that a person who is terminated after unsuccessfully seeking an accommodation may pursue a retaliation claim under the ADA, if the person had a good faith belief that the requested accommodation was appropriate. *Hill*, 737 F.3d at 1218 (citing *Heisler v. Metro. Council,* 339 F.3d 622, 632 (8th Cir. 2003)).

To establish a *prima facie* case of retaliation, Ms. Coleman must show that she engaged in protected activity based on a reasonable, good faith belief that an agent of the employer was engaging in disability discrimination and that she suffered an adverse employment action causally linked to that protected conduct. *Lenzen v. Workers Comp. Reinsurance Ass'n*, 705 F.3d 816, 821 (8th Cir. 2013). Such claims typically are analyzed under the *McDonnell Douglas* burden-shifting framework. *Hill*, 737 F.3d at 1719 (referring to *McDonnell Douglas,* 411 U.S. at 802-03).

On the record before the Court, Ms. Coleman cannot establish that she was terminated in retaliation for requesting an accommodation under the ADA.  Ms. Coleman did not request an accommodation until she filed a grievance to appeal of her termination on February 3, 2017, several days after her termination.  Further, as set forth above, the ADC terminated Ms. Coleman pursuant to its FMLA policy because she had exhausted her FMLA and paid leave, she was on leave without pay status for over a month, and her health care provider indicated that she could not perform the essential functions of her job.  When it terminated Ms. Coleman, the ADC made clear that Ms. Coleman was eligible for rehire when she could perform the essential functions of the job of Sergeant or any other job within the ADC for which she applied.

Based on the evidence before the Court, even with all reasonable inferences construed in favor of Ms. Coleman, no reasonable fact finder could find that the ADC terminated Ms. Coleman for engaging in protected conduct related to her alleged disability.

### IV.   Conclusion

For the above reasons, the Court grants ADC's motion for summary judgment and enters judgment in its favor (Dkt. No. 31).  The Court dismisses with prejudice Ms. Coleman's claims (Dkt. No. 2).  Ms. Coleman's request for relief is denied (*Id.*).  Judgment will be entered accordingly.

So ordered this 23rd day of September, 2021.


_____
Kristine G. Baker
United States District Judge